## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

          Plaintiff,

v.

Brennan Walter Thomas,

          Defendant.

Case No. 23-cr-232 (DWF/DJF)

**REPORT AND RECOMMENDATION**

## INTRODUCTION

This matter is before the Court on Defendant Brennan Walter Thomas's Motion to Suppress Evidence as a Result of Illegal Search and Seizure ("Motion to Suppress") (ECF No. 31) and Motion to Dismiss the Indictment ("Motion to Dismiss") (ECF No. 48).[1] The Court held a hearing on Mr. Thomas's Motion to Suppress on September 25, 2023. (ECF No. 37).[2] Ryan M. Pacyga appeared on behalf of Mr. Thomas. (*Id.*) Emily Polachek appeared on behalf of the Government. (*Id.*) Based on the parties' written submissions, hearing testimony, and on the entire file, the Court recommends both of Mr. Thomas's motions be denied.

---

[1] The undersigned United States Magistrate Judge considers this matter pursuant to a general referral in accordance with the provisions of 28 U.S.C. § 636 and Local Rule 72.1.

[2] Mr. Thomas filed his Motion to Suppress and a number of non-dispositive pretrial motions (ECF Nos. 18-30) in August 2023. The Court addressed his non-dispositive motions in by Order dated October 4, 2023. (ECF No. 40.) On November 30, 203, Mr. Thomas simultaneously filed a Motion for Leave to File Additional Motions (ECF No. 47) and his Motion to Dismiss (ECF No. 48). On December 1, 2023, the Court granted his Motion for Leave to File Additional Motions (ECF No. 49). As set forth below, Mr. Thomas's Motion to Dismiss does not contain material facts in dispute. Accordingly, an evidentiary hearing is unnecessary. *United States v. Pacheco-Poo*, 952 F.3d 950, 954 (8th Cir. 2020). The Court therefore considers both his Motion to Dismiss and Motion to Suppress in this Report and Recommendation.

## BACKGROUND

On July 12, 2023, the Government charged Mr. Thomas in a single-count Indictment with possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1) and 924(a)(8). (ECF No. 1.) The events that led to Mr. Thomas's indictment occurred on April 14, 2023. (*Id.* at 1.) At approximately 9:36:44 p.m. that night, the manager of Union Liquor called 911 to report that someone outside the store was acting "belligerent" and pointing a gun at people ("First 911 Caller") (Gov't Ex. 2 at 0:00-0:11 (describing suspect), 0:47-49 (identifying himself as the manager of the liquor store)). The First 911 Caller described the person with the gun as a black man with a black hat who was wearing a white shirt with some blue jeans or blue jean shorts, blue and yellow stripes, and black Air Jordan sneakers, and said, "he was sitting right here in the parking lot right now." (*Id.* at 0:30-0:46, 1:47-1:57.) After providing a description, the First 911 Caller said the man had the gun in his hand (*id.* at 2:05) and was standing with the gun right outside the door (*id.* at 2:24-1:30). The call lasted 2 minutes and 52 seconds and ended at 9:39:38 p.m. (*Id.*) The First 911 Caller called back at approximately 9:41:20 p.m. to describe the gun ("911 Incident Detail Report") (Def. Ex. 5 at 2).[3]

The City of Minneapolis's live-stream security cameras ("Milestone Cameras") located near Union Liquor store do not show anyone matching the caller's description at the time of the call, but the Milestone Cameras do not focus on the entrance of the store until approximately one minute into the call. (Govt. Ex. 8 at 0:45-3:37.) At 9:39:08 p.m., when the caller said the man had

---

[3] Neither party offered audio of this call, but a 911 Incident Detail Report memorializes it. (*See* Defense Ex. 5; *see also* ECF No. 45 at 2-3 n.2.)

a gun in his hand, the Milestone Cameras also do not capture what was happening outside the front door. (*Id.* at 3:08, cutting away from a group of people previously shown standing near the door.)

At approximately 9:44:29 p.m., a second person called 911 to report there was "a black man with a gun in his hand being aggressive" ("Second 911 Caller") (Gov't Ex. 1 at 0:05-0:08). The Second 911 Caller initially reported the person with the gun was right outside the store (*id.* at 0:12-0:14) and described the person as wearing a white shirt and a black hat (*id.* at 0:16-0:23). The Second 911 Caller then said the person with gun was next to a white truck. (*Id.* at 0:33.) The caller did not provide a name, but their phone number is recorded on the 911 Incident Detail Report. (*See* Def. Ex. 5 at 2.) The call lasted 1 minute and 10 seconds and ended at 9:45:39 p.m. (*Id.*) The Milestone Cameras during this time show a man wearing a white shirt and black hat next to a white truck conversing with two other men and the driver of the truck. (Gov't Ex. 8 at 8:29-9:39.) The Milestone Cameras only capture the top half of the man's body because the bottom half is blocked by the truck. (*Id.*) The Milestone Cameras do not capture sound, so the nature of the discussion is unclear, however, no person appeared to be in distress. (*Id.*) The Government claims that just prior to the second call, the Milestone Cameras show what appears to be a gun in the hand of the man in the white shirt. (ECF No. 45 at 4-5, citing Milestone Cameras at 8:14.) Mr. Thomas claims the Government mistakes an image on the person's t-shirt for a gun. (ECF No. 46 at 4-6.) Several minutes after the call, the Milestone Cameras show a person wearing a white shirt, black hat, and blue and yellow striped shorts outside the door of the liquor store, possibly holding something in his left hand. (*Id.* at 15:17-15:18; 15:52.) The Government claims

the item could have been a gun.  (ECF No. 45 at 3.)  Mr. Thomas claims it was likely a cellphone. (ECF No. 46 at 6.)

### 1.      Officer Derek Spee's Testimony

During Mr. Thomas's hearing, Minneapolis Police Officer Derek Spee testified that he was working on reports at his desk in the Fourth Precinct when the 911 calls were made.  (ECF No. 38 at 16:9-14.)  Officer Spee stated that he was familiar with Union Liquor and had made narcotics and drug arrests in its parking lot in the past.  (*Id.* at 16:22-25.)  He testified that based on the 911 calls, he focused the Milestone Cameras on the parking lot at Union Liquor.  (*Id.* 18:15-17.) Officer Spee further testified that the Milestone Cameras allowed him to identify a person matching the description provided by the 911 callers in the Union Liquor parking lot.  (*Id.* at 18:19-19:1; *see also* Gov't Ex. 8 at 8:14 (Milestone Cameras showing a person wearing a white short-sleeved shirt and black hat standing next to a white truck); Ex. 10 (screenshot from Milestone Cameras of a person wearing a white short-sleeved shirt, black hat, blue and yellow striped shorts, and black shoes near the outside door of Union Liquor).)

Officer Spee explained that, due to safety concerns, officers did not attempt to approach the allegedly armed person until there were fewer people in the parking lot.  (*Id.* at 19:1-18.) Officer Spee testified that officers chose instead to continue to monitor the person on the Milestone Cameras.  (*Id.* at 19:19-23.)  The Milestone Cameras show a person matching the 911 callers' descriptions with his hands in his pockets.  (Gov't Ex. 8 at 20:27-20:37.)  Officer Spee testified that the person was not continuously visible on the Milestone Cameras, including when he walked

between cars or when buses came to a nearby stop. (ECF No. 38 at 41:14-18, 51:1-52:5; *see also* Gov't Ex. 8 at 35:12-36:00.)

Officer Spee further testified that another officer who was watching the Milestone Cameras commented that it looked like there was a gun inside the person's pocket. (ECF No. 38 at 20:4-8.) The other officer documented in his incident report that, based on his surveillance, he determined the suspect had a handgun in his waistband, "as it appeared to be the handguns [sic] handle protruding from the waistband" and the suspect "kept holding his shorts as if he was attempting to keep the handgun in place." (Def. Ex. 4.)

Officer Spee testified that he subsequently also observed on the Milestone Camera footage "what could have been a gun" inside the person's pocket (*id.* at 20:7-8), but did not see anything in the person's waistband that could be a gun (*id.* at 36:22-24), and did not see anyone in the parking lot with a gun in their hand (*id.* at 39:13-14). Officer Spee's incident report does not reflect that he saw anything on the Milestone Cameras that could be a gun (Def. Ex. 5), but he testified that his memory of seeing a possible gun on the video was clear. (ECF No. 38 at 21:16-22:10.)

Officer Spee testified that after Union Liquor closed, he located the person he had been monitoring on the Milestone Cameras at a nearby bus stop. He and his partner decided to approach, with additional officers acting as backup. (*Id.* at 22:11-17, 23:11-24:6.) He testified that other officers stayed in the precinct to continue to monitor the person on the Milestone Cameras. (*Id.* at 22:24-23:5.) Officer Spee explained that he approached the person with his weapon drawn because he was concerned the person posed a high threat level due to possibly having a gun. (*Id.* at 24:10-19.) Officer Spee testified that he directed the person to put his hands up, but the person walked

away instead. (*Id*. at 24:20-24.) He further testified that he continued to yell at the person to comply with his directions, but the person continued to walk away. (*Id*. at 24:24-25:3.)

Officer Spee then approached the person, who turned out to be Mr. Thomas. (*Id*. at 26:5-10.) Officer Spee holstered his pistol and "took ahold" of Mr. Thomas's wrists to stop him from fleeing before placing him in handcuffs. (ECF No. 38 at 26:8-23.) Officer Spee stated that his intent was to temporarily detain Mr. Thomas to conduct a pat-down for weapons. (*Id*. at 26:24-27:2.) Officer Spee testified that he was not able to conduct the pat-down, though, because Mr. Thomas was not cooperative. (*Id*. at 27:3-5.) Officer Spee explained that Mr. Thomas continued to move, try to get away, and manipulate his body so that officers could not search him. (*Id*. at 27: 7-9.) Officer Spee testified that he decided to place Mr. Thomas on the ground to better control him and told him he was under arrest for obstructing the legal process. (*Id*. at 27:9-17.) Officer Spee stated that he then successfully completed the pat-down. (*Id*. at 27:18-20.) He explained that the areas where weapons are most often found include "the waistband, front, back, sides, and also pockets." (*Id*. at 50:6-20.) Officer Spee testified that officers initially searched Mr. Thomas's right-side pocket and retrieved a cellphone. (*Id*. at 34:5-9.) He further testified that he felt a hard, metal object that could have been a firearm while patting the left side of Mr. Thomas's shorts, but Mr. Thomas rolled over so that the officers could not access his shorts pocket. (*Id*. at 27:23-28:3.) Officer Spee testified that when Mr. Thomas continued to prevent officers from searching his left pocket, Officer Spee directed another officer to cut Mr. Thomas's shorts off. (*Id*. at 29:19-30:1.) The officers found a gun inside the left pocket. (*Id*. at 30:4-5.)

### 2. Video Evidence

The Milestone Cameras and Officer Spee's body camera captured video of Mr. Thomas's apprehension that is largely consistent with Officer Spee's testimony. The Milestone Cameras

show four people in a bus shelter. As the officers approached the person they had been monitoring, two of them started to walk away, including the suspect. (Gov't Ex. 8 at 37:34-37:41.) Officer Spee's body camera shows that at 10:13:34 p.m. he yelled, "Get your hands up!" followed by "You!" as he ran towards the person he had been monitoring. (Gov't Ex. 7 at 1:04-1:05.) The person looked back at Officer Spee with his hands at chest level, and began to lift them. (*Id.* at 1:06-1:10.) The Milestone Cameras show three officers converging on the person with weapons drawn. (Gov't Ex. 8 at 37:40-37:43.) Officer Spee's body camera shows that, at 10:13:41, he told the person not to move and placed him in handcuffs. (Gov't Ex. 7 at 1:11-1:13.) Another officer stated, "You've got a gun … Right pocket. Right pocket." (*Id.* at 1:22-1:32.) As he was being handcuffed, Mr. Thomas asked the officers why they had stopped him, told the officers his name was Brennan Thomas, and stated that what the officers thought was a gun was actually a cellphone. (*Id.* at 1:15-1:39.)

Consistent with Mr. Thomas's statement, a police officer emptied Mr. Thomas's right pocket and recovered a cellphone. (*Id.* at 1:48-1:50.) Officer Spee's body camera shows Mr. Thomas contorting his body as police officers repeatedly told him to stop moving so they could search him. (*Id.* at 1:44-1:54.) A few seconds after the officers recovered the cellphone, a police officer told Mr. Thomas he was under arrest. (*Id.* at 2:00.) Mr. Thomas asked, "For what?" (*Id.* at 2:01.) An officer responded, "For obstruction." (*Id.* at 2:02.) Officer Spee's body camera shows the officers struggling to search Mr. Thomas and forcing him to the ground as he moved around. (*Id.* at 2:02-2:23.) Mr. Thomas continued to ask why he was under arrest. (*Id.* at 2:29-2:34.) An officer explained there were multiple 911 calls reporting Mr. Thomas had a gun, and said he still needed to search Mr. Thomas's left pocket so he could do his job. (*Id.* at 2:35- 2:44.) Another officer told Mr. Thomas he was obstructing the legal process. (*Id.* at 3:16.) When Officer

Spee attempted to search Mr. Thomas's left pocket, Mr. Thomas rolled onto his left side. (*Id.* at 3:30-3:34.) The officers then cut Mr. Thomas's shorts to continue their search, repeatedly asking him to stop resisting. (*Id.* at 4:18-5:11.) After removing Mr. Thomas's shorts, the officers found a gun in his left pocket. (*Id.* at 5:13.)

## DICUSSION

### I.    Motion to Suppress

Mr. Thomas argues the gun police discovered when they searched him was a search subject to arrest and must be suppressed because the police acted without probable cause or a warrant. (ECF No. 42 at 10-13; *see also* ECF No. 46 at 2.) To the extent his apprehension could be construed as an investigative stop rather than an arrest, Mr. Thomas argues the gun still should be suppressed because the facts in this case do not give rise to reasonable suspicion to support such a stop. (ECF No. 42 at 13-21; *see also* ECF No. 46 at 2-6.) Mr. Thomas asks the Court to suppress the gun pursuant to the exclusionary rule as fruit of the poisonous tree (i.e., his warrantless arrest). (ECF No. 42 at 19-21, citing *U.S. v. Simpson*, 439 F.3d 490, 493–94 (8th Cir. 2006); *see also* ECF No. 46 at 6-7.)

#### A.    Legal Standards

##### 1.    Warrantless Searches

"The Fourth Amendment protects individuals against unreasonable searches and seizures by the government." *United States v. Williams*, 521 F.3d 902, 905 (8th Cir. 2008). "A warrantless search is presumptively unreasonable absent some exception to the warrant requirement." *United States v. Ringland,* 966 F.3d 731, 735 (8th Cir. 2020) (quotation omitted). One such exception is the well-established rule that an officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area within the person's immediate control. *See Davis v.*

*United States*, 564 U.S. 229, 232 (2011) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). This search-incident-to-arrest exception to the warrant requirement is justified by the need to secure "officer safety and evidence preservation." *Arizona v. Gant*, 556 U.S. 332, 337 (2009).

### 2.     Warrantless Arrests vs. Investigative Stops

"A warrantless arrest that lacks probable cause violates the Fourth Amendment." *Robbins v. City of Des Moines*, 984 F.3d 673, 679 (8th Cir. 2021). "Probable cause exists 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *United States v. Flores-Lagonas*, 993 F.3d 550, 560 (8th Cir. 2021) (citations omitted). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id*. (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). "Probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." *United States v. Edwards*, 891 F.3d 708, 711–12 (8th Cir. 2018) (internal quotation marks and citation omitted).

Even in the absence of probable cause, "[p]olice officers may briefly detain a person if they have a reasonable articulable suspicion that criminal activity is afoot; a mere hunch will not suffice." *United States v. Pope*, 910 F.3d 413, 414 (8th Cir. 2018) (citing *United States v. Cotter*, 701 F.3d 544, 547 (8th Cir. 2012)). Such investigatory stops are often called *Terry* stops, after the namesake case *Terry v. Ohio*, 392 U.S. 1 (1968). Courts consider the "'the totality of the circumstances' when determining whether reasonable suspicion supported an officer's stop." *Pope*, 910 F.3d at 414 (quoting *Cotter*, 701 F.3d at 547). The determination of whether officers had reasonable suspicion is based on "what the officer reasonably knew at the time rather than

assessing the existence of reasonable suspicion with the vision of hindsight." *United States v. Slater*, 979 F.3d 626, 629 (8th Cir. 2020 ) (internal quotation marks and citation omitted).

In distinguishing between an arrest and an investigatory stop the Eighth Circuit has held that "[a]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.  Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994) (quotation omitted); *accord United States v. Sanford*, 813 F.3d 708, 713 (8th Cir. 2016); *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010); *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999).  "A de facto arrest occurs when the officer's conduct is more intrusive than necessary for a *Terry* investigative stop." *Sanford*, 813 F.3d at 712-13; *accord Bloomfield*, 40 F.3d at 916-17; *Jones*, 759 F.2d at 636.  But "[t]here is no clear line between investigative stops and de facto arrests." *Sanford*, 813 F.3d at 712; *accord Bloomfield*, 40 F.3d at 916; *Jones* 759 F.2d at 636.

Though a *Terry* stop must be less intrusive than an arrest, depending on the circumstances officer safety may be a reasonable concern.  Therefore, "[a]s part of a lawful *Terry* stop, officers may take any measures that are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *Newell*, 596 F.3d at 879 (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)); *accord Sanford*, 813 F.3d at 713; *Navarrete-Barron*, 192 F.3d at 790; *Jones*, 759 F.2d at 636-37.  This includes a pat-down frisk to check for weapons. *Navarrete-Barron*, 192 F.3d at 790.  "When officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *Sanford*, 813 F.3d

at 713 (quotation omitted); *see, e.g.*, *Navarrete-Barron*, 192 F.3d at 791 ("The limits of a *Terry* stop were also not exceeded when the defendant was handcuffed and placed in a police car while the officers searched the truck."); *Jones*, 759 F.2d at 638 ("An approach to a car by officers with guns drawn does not elevate an investigative stop into an arrest if the police action is reasonable under the circumstances.").

### 3.    The Exclusionary Rule

Evidence obtained in violation of the Fourth Amendment cannot be used against the victim of an illegal search or seizure. *See, e.g.*, *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011). "Under the 'fruit of the poisonous tree' doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality." *United States v. Simpson*, 439 F.3d 490, 493–94 (8th Cir. 2006) (quoting *Hamilton v. Nix*, 809 F.2d 463, 465 (8th Cir.1987), citing *Wong Sun v. U.S.*, 371 U.S. 471, 488 (1963)). "[E]vidence should be excluded, however, only if the illegality is at least a but-for cause of obtaining the evidence." *United States v. Hastings*, 685 F.3d 724, 728 (8th Cir. 2012) (internal quotation marks and citation omitted); *accord Miller*, 11 F.4th at 954; *Riesselman*, 646 F.3d at 1078. "The controlling question is 'whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Yousif*, 308 F.3d 820, 829 (8th Cir. 2002) (quoting *Wong Sun*, 371 U.S. at 488 (1963)).

### B.    Analysis

Mr. Thomas argues he was under de facto arrest at 10:13 p.m., when three police officers converged on him with weapons drawn and apprehended him because they believed he had a gun.

(ECF No. 42 at 12-13; *see also* ECF No. 46 at 2.)  He claims the arrest was illegal because officers acted without a warrant and lacked probable cause to believe he was committing a crime.  (ECF No. 42 at 12-13; *see also* ECF No. 46 at 2.)  He argues on that basis that the gun officers seized in the search subsequent to his unlawful arrest must be suppressed pursuant to the exclusionary rule. In response, the Government argues the police initiated a lawful *Terry* stop, which turned into a lawful arrest based on probable cause at approximately 10:14 p.m. when Mr. Thomas obstructed the legal process through his noncompliance with their search.  (ECF No. 45 at 18-19.)

### 1.    The Encounter Began as a *Terry* Stop

The Court first considers whether Mr. Thomas's encounter with the police began as a de facto arrest requiring probable cause or as a *Terry* stop requiring only reasonable suspicion. Although three police officers converged on Mr. Thomas with their weapons drawn (Gov't Ex. 8 at 37:40-37:43), the Court cannot conclude that he was under de facto arrest at that time, or any other time until the police formally arrested him at 10:14:30 p.m. for obstructing legal process.  As discussed in greater detail below, the record evidence supports a finding that police had a reasonable suspicion that Mr. Thomas was in possession of a dangerous weapon, which he had publicly brandished in an aggressive manner in a populated area.  Under these circumstances, the officers were allowed to take reasonable measures to protect their personal safety without converting the investigatory stop into an arrest.  This included approaching Mr. Thomas with their weapons drawn and placing him in handcuffs.  *Sanford*, 813 F.3d at 713.

### 2.    Probable Cause Supported the Arrest

The testimony and video evidence offered at the hearing supports the Government's contention that police had probable cause to arrest Mr. Thomas for obstructing the police investigation.  The Milestone Cameras show that as the police approached Mr. Thomas to

investigate the 911caller reports, he started to walk away. (Gov't Ex. 8 at 37:34-37:41.) Although Mr. Thomas began to lift his hands and slowed down soon after Officer Spee told him to stop walking away, he continued to walk away from them (Gov't Ex. 7 at 1:04-1:14). Officer Spee's body camera shows that, even after the officers stopped and hand-cuffed Mr. Thomas he refused to stand still, instead contorting his body as police officers repeatedly told him to stop moving so they could search him (*id.* at 1:44-1:54). Officer Spee testified he was not able to conduct a pat-down search because Mr. Thomas was not cooperative. (ECF No. 38 at 27:3-5.) He explained that Mr. Thomas continued to move to try to get away from the officers or manipulate his body so the officers could not make contact with him. (*Id.* at 27:7-9.) Based on this behavior, Officer Spee determined the best way to control Mr. Thomas was to force him to the ground. (*Id.* at 9-10.) Officer Spee then forced Mr. Thomas to the ground and placed him under arrest at 10:14:30 p.m. for obstructing legal process. (*Id.* at 9-17; Gov't Ex. 7 at 2:00-2:02.) The body camera footage shows Mr. Thomas continued to contort his body and move it around, in what appears to be an attempt to obstruct the search, while the officers struggled to search him. (*Id.* at 2:02-2:23.) Mr. Thomas resisted so forcefully that the officers had to cut off his shorts in order to search his left pocket, where the gun was found. (*Id.* at 3:30-5:15.)

Under Minnesota law, it is crime to obstruct legal process, Minn. Stat. § 609.50, subd. 1. Mr. Thomas's failure to stop walking as instructed, and to stop moving as ordered so that the officers could safely conduct a pat-search, established probable cause for his arrest under this statute. *United States v. Walke*r, No. 17-cr-181 (JRT/DTS), 2017 WL 8944018, at *3 (Oct. 25, 2017) (finding probable cause to arrest a defendant who refused to obey a lawful police order). Thus, the more invasive search of Mr. Thomas's person conducted after police placed him under arrest was justified under the search-incident-to-arrest exception to the warrant requirement. *See,*

*e.g.*, *United States v. Wright*, 844 F.3d 759, 763 (8th Cir. 2016) ("[I]t is permissible to search an arrestee's person incident to arrest.")  Based on the above, the Court finds that police lawfully seized the gun when they searched Mr. Thomas incident to his arrested based on probable cause to believe he was obstructing legal process.

### 3.    Reasonable Suspicion Supported the *Terry* Stop

Mr. Thomas urges the Court to suppress the gun as a fruit of the poisonous tree on grounds that police lacked reasonable suspicion to conduct the initial investigative stop.  (ECF No. 42 at 13-21; *see also* ECF No. 46 at 2-6.)  He contends: (1) the 911 calls were not reliable because they were anonymous and the Milestone Camera footage the police watched in real-time did not support them; and (2) the Milestone Cameras does not show a weapon in Mr. Thomas's waistband or pocket.  (ECF No. 42 at 13-18; *see also* ECF No. 46 at 3- 6.)  The Government maintains that under the totality of the circumstances, the officers had reasonable suspicion to conduct a *Terry* stop because:  (1) two 911 callers described a man fitting the same description as having a gun and acting aggressively; (2) Mr. Thomas was in a high-crime area; (3) police verified the 911 callers' information using the Milestone Cameras; (4) officers independently saw what could have been a firearm in Mr. Thomas's pocket and waistband; and (5) Mr. Thomas walked away from the officers when they asked him to stop.[4]  (ECF No. 45 at 11-12.)

### a.    The 911 Calls

Mr. Thomas challenges the 911 calls as unreliable on grounds that they were anonymous and unsupported by the Milestone Cameras.  (ECF No. 42 at 13-15.)  Because the callers did not

---

[4] Mr. Thomas contends he stopped walking away when he realized Officer Spee might be yelling at him.  (ECF No. 46 at 6-7.)  The Court has reviewed the footage from Officer Spee's body camera and disagrees (Gov't Ex. 7 at 1:06-1:10).  While it appears that Mr. Thomas slowed down when he saw the officers coming, he kept walking away from them, albeit slowly.  And in

provide their names, Mr. Thomas claims the 911 calls were no more than anonymous tips, which lacked an appropriate basis of knowledge or veracity to establish the requisite suspicion to support a *Terry* stop. (*Id.*, citing *Florida v. J.L.*, 529 U.S. 266, 270–72 (2000) (finding an anonymous tip lacked sufficient indicia of reliability to justify a stop and frisk even though it alleged illegal possession of a gun) and *Alabama v. White*, 496 U.S. 325, 329 (1990) ("an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity")). In this case, however, although the callers did not leave their names they provided enough information to make themselves identifiable. The First 911 Caller identified himself as the manager of the nearby liquor store (*see* Gov't Ex. 2 at 0:47-49), rendering his identity easily discoverable. The Second 911 Caller's phone number is memorialized in the 911 Incident Detail Report (Def. Ex. 5 at 2), and for this reason it is afforded greater deference than a mere, untraceable anonymous tip. *See Navarette v. California*, 572 U.S. 393, 401 (2014) (upholding officer's reliance on information reported in an anonymous 911 call because the 911 system permits law enforcement to verify important information about the caller). Moreover, the fact that police received similar information from two separate 911 callers, whose information corroborated each other, increased their reliability and distinguishes this case from those involving a single anonymous tip.

Mr. Thomas also contends the Milestone Cameras do not substantiate the 911 calls. (ECF No. 42 at 14-16.; *see also* ECF NO. 46 at 3-5.) He claims the First 911 Caller inaccurately described the clothing and location of the suspect, and that the Milestone Camera did not show a gun at 9:39:08 p.m. when the caller said the suspect was displaying it. (ECF No. 42. at 14-15, citing Govt' Ex. 8 at 3:08.) The First 911 Caller called in at 9:36:44 p.m. and initially described

---

any event, for the reasons stated herein, the Court finds police had reasonable suspicion before they asked him to stop.

the person with the gun as a black man with a black hat, "about maybe 6 feet tall" with some "shorts on…blue jean shorts." (Gov't Ex. 2 at 0:29-0:50.) Later in the call he described the person as wearing a white shirt with some blue jeans, blue and yellow stripes, and black Air Jordan sneakers and said, "he was sitting right here in the parking lot right now." (*Id.* at 1:47-1:57.) While Mr. Thomas was not wearing blue jeans, he was wearing shorts with blue and yellow stripes, a white shirt, and black shoes. (Gov't Ex. 3, 5, 6.) So, though the caller equivocated about what the person with the gun was wearing on his legs, the reported details regarding the color of the hat, shoes and shirt, and the color of the stripes, precisely matched what Mr. Thomas was wearing. And though Mr. Thomas is correct that the Milestone Cameras did not show a gun at 9:39:08 p.m. as reported, this is explained by the fact that the Milestone Cameras did not cover the entire area from the caller's viewpoint. They did not actually focus on the entrance of the store until approximately one minute into the call. (Govt. Ex. 8 at 0:45-3:37.) The panning Milestone Cameras also did not capture the entirety of the parking lot at once. For example, at 9:39:08 p.m., when Mr. Thomas says the Milestone Cameras did not show a gun, the Milestone Cameras panned out and failed to capture a group of people previously shown standing near the door. (Gov't Ex. 8 at 3:08, cutting away from a group of people previously shown standing near the door.) There were also times when the Milestone Cameras were blocked by vehicles. (*See, e.g.*, *id.* at 3:31-3:33.) The absence of footage of the gun at 9:39:08 p.m. thus does not prove the First 911 Caller's report was inaccurate, but merely reflects that the Milestone Cameras were incapable of capturing the entire scene.

Mr. Thomas also contends that nothing the Second 911 Caller reported was true. (ECF No. 42 at 15-16.) At 9:44:29 p.m., the Second 911 Caller reported "a black man with a gun in his hand being aggressive." (Gov't Ex. 1 at 0:05-0:08.) The Second 911 Caller initially reported the

person with the gun was right outside the store (*id.* at 0:12-0:14) and described the person as wearing a white shirt and a black hat (*id.* at 0:16-0:23). The Second 911 Caller later said the person he had seen with the gun was next to a white truck. (*Id.* at 0:33.) Mr. Thomas contends that, just prior to the Second 911 Caller's report, the Milestone Cameras did not show anyone behaving aggressively; rather, they showed a group of men chatting and goofing around next to a white truck with no gun in anyone's hands. (ECF No. 42 at 15-16, citing Gov't Ex. 8 at 7:58.)

But the Second Caller reported seeing the man pointing the gun *before* the 911 call (Gov't Ex. 1 at 0:38-0:43), and it was impossible for police reviewing the footage to know exactly how long before the call he might have witnessed the alleged behavior. Moreover, consistent with the Second 911 Caller's report, the Milestone Cameras during the call showed a man wearing a white shirt and black hat next to a white truck conversing with two other men and the driver of the truck. (Gov't Ex. 8 at 8:29-9:39.) Furthermore, the Milestone Cameras only captured the top half of the man's body since bottom half was blocked by the truck (*id.*), and because the Milestone Cameras do not have sound, the nature of the group's discussion was unclear. (*Id.*) The Government contends that, just prior to the call, the Milestone Cameras showed what appears to be a gun in the suspect's hand. (ECF No. 45 at 4-5, citing Milestone Cameras at 8:14.)

Having reviewed the relevant video footage, the Court cannot draw a conclusion from this evidence regarding whether or not the man was holding a gun in his hand. But because the video footage is incomplete and does not plainly refute the Second 911 Caller's report, it does not establish sufficient grounds to discount its reliability. As discussed above, the Milestone Cameras largely supported the accounts of both Callers. And the fact that each Caller, within minutes of each other, provided similar descriptions of a person the Milestone Cameras also showed, bolsters the veracity of their claims. *Slater*, 979 F.3d at 630. Officer Spee testified that the Milestone

Cameras allowed him to identify a person matching the 911 Callers' descriptions in the liquor store parking lot.  (*Id.* at 18:19-19:1; *see also* Gov't Ex. 8 at 8:14 (Milestone Cameras showing a person wearing a white short-sleeved shirt and black hat standing next to white truck); Gov't Ex. 10 (screenshot from Milestone Cameras of a person wearing a white short-sleeved shirt, black hat, blue and yellow striped shorts, and black shoes near the outside door of Union Liquor).)  To the extent Mr. Thomas argues the Milestone Cameras do not corroborate the 911 Callers' reports because they did not conclusively show a gun or prove any person was acting aggressively, the Court notes that reasonable suspicion is not based on hindsight, but on what the police reasonably knew at the time.  *Id.* at 629.  It was reasonable for the police to consider that the Milestone Cameras were imperfect insofar as they lacked sound, were occasionally fully or partially blocked, and left questions as to what the suspect may or may not have been holding.  The Court therefore finds that both the First and Second 911 Caller contributed to the reasonable suspicion necessary to support the *Terry* stop.

### b.    The Milestone Camera Footage

Mr. Thomas also claims the Milestone Cameras do not support reasonable suspicion for a *Terry* stop because they did not conclusively show him holding a gun. (ECF No. 42 at 16-19.)  He points out that while one officer wrote in his incident report that he saw what appeared to be a handgun in Mr. Thomas's waistband, Officer Spee testified that he saw what could have been a firearm in Mr. Thomas's right pocket.  (*Id.* at 16-17.)  Mr. Thomas argues the Milestone Cameras clearly show the item in his pocket was rectangular—likely his cellphone.  (*Id.* at 17-18.)  He contends that based on the First and Second 911 Caller's reports, the officers were suffering from

18

confirmation bias and only saw a handgun because that is what they expected to see.  (*Id.* at 16-17.)

Noting Mr. Thomas's objection, the Court also finds the Milestone Cameras support reasonable suspicion for the *Terry* stop.  As Mr. Thomas points out, two police officers monitoring the Milestone Cameras believed they observed a gun on a person matching the 911 Callers' descriptions.  (*See* Def. Ex. 4 (surveilling officer's police report); ECF No. 38 at 20:7-8 (Officer Spee's testimony that he observed the suspect with a firearm on the Milestone Cameras).)  During his testimony, Officer Spee explained that the areas where weapons are most often found include "the waistband, front, back, sides, and also pockets." (*Id.* at 50:6-20.)

Upon its own independent review of the Milestone Camera footage, the Court also observed, at various times, what could be construed as a gun on Mr. Thomas's person.  (*See, e.g.*, Gov't Ex. 8 at 8:14; 15:17-15:18; 15:52.)  As previously noted, reasonable suspicion is not based on hindsight, but on what the police reasonably knew at the time.  *Slater*, 979 F.3d at 629.  Moreover, probable cause was not required to justify the investigatory stop.  Here, the Court finds it was reasonable for the officers monitoring the Milestone Cameras to suspect that Mr. Thomas could have had a gun based on what they saw.  The footage was not conclusive proof, but it bolstered the reasonable articulable suspicion that criminal activity was afoot sufficient to justify a *Terry* stop.  *Pope*, 910 F.3d at 414.

### c.    Other Evidence Supporting Reasonable Suspicion

The location of the events was also a factor.  Officer Spee testified that the Union Liquor Parking Lot was a high-crime area where police had previously made arrests for narcotics and firearms.  (ECF No. 38 at 16:22-25.)  A person's presence in a high-crime area is not sufficient by itself to constitute reasonable suspicion, but it is "among the relevant contextual considerations in

a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  The location of the reported

criminal activity thus contributed to reasonable suspicion justifying the stop.

### d.    Totality of the Circumstances

In light of all of the above, the officers' suspicion that Mr. Thomas had been brandishing

a gun was reasonable.  The record reflects that: (1) within minutes of each other, two independent,

sufficiently reliable 911 callers reported a similarly attired man holding a gun and acting out of

control; (2) the Milestone Cameras supported the 911 callers' accounts; (3) the Milestone Cameras

supported police officers' own observations of a man matching the 911 callers' descriptions with

something that could be gun; and (4) the alleged gunman's location was in a high-crime area.

Based on the totality of the circumstances and what the police officers reasonably knew at the time,

the Court finds the officers had reasonable articulable suspicion to support a *Terry* stop.  *Pope*,

910 F.3d at 414; *Slater*, 979 F.3d at 629.  The Court therefore recommends Mr. Thomas's Motion

to Suppress be denied on this basis as well.

## II.    Motion to Dismiss

As noted above, Mr. Thomas is charged with a single count of being a felon in possession

of a firearm in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 1.)  In his Motion to Dismiss (ECF

No. 48), Mr. Thomas argues this charge is unconstitutional under the Second Amendment as

interpreted in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), and is

therefore unconstitutional as applied to him.  (ECF 48.)  Although an "as applied" constitutional

challenge is typically premature when brought as a pretrial motion, *see United States v. Turner*,

842 F.3d 602, 605 (8th Cir. 2016), the Court addresses Mr. Thomas's Motion to Dismiss now

because his arguments are foreclosed by binding precedent.  *See United States v. Jackson*, 69 F.4th

495, 501–06 (8th Cir. 2023) (holding that section 922(g)(1) is constitutional as applied generally

to all felons)).   Mr. Thomas acknowledges that *Jackson* reaffirmed section 922(g)(1) is constitutional following the *Bruen* decision, but he nevertheless filed his Motion to Dismiss to preserve the issue for further review.  (ECF No. 48 at 1.)

### A.    Legal Standard

The Second Amendment states: "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."  In D*istrict of Colombia v. Heller*, 554 U.S. 570, 602–03 (2008), the Supreme Court held that this language confers a limited individual right to keep and bear arms "for defensive purposes" within the home. Though *Heller* did not undertake an in-depth historical analysis of the permissible limitations on the right to keep and bear arms, it noted that "nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626–27.

More recently, in *Bruen*, 142 S. Ct. at 2122, the Supreme Court extended *Heller's* holding, concluding that "ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense[.]"  In reaching this conclusion, *Bruen* stated that the test for determining the constitutionality of a regulation limiting the right to possess or carry a firearm requires courts to survey the historical record to consider whether "historical precedent from before, during, and even after the founding evinces a comparable tradition of regulation."  *Id.* at 2132 (internal quotation and citation omitted).  To determine whether a regulation is sufficiently analogous, courts should focus on "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2133 (citations omitted).  "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is

comparably justified are central considerations" in this "analogical inquiry." *Id.* (internal citations and quotations omitted).

In *Jackson*, 69 F.4th at 501–06, the Eighth Circuit applied the precedent established in *Bruen* to 18 U.S.C. § 922(g)(1), which criminalizes possession of a firearm or ammunition for those "who [have] been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." The court deemed the statute constitutional, even as applied to individuals with "non-violent" convictions that do not necessarily demonstrate the individual is "more dangerous that the typical law-abiding citizen." *Jackson* emphasized that *Heller* expressly carved out "the longstanding prohibition on the possession of firearms by felons" from the right to bear arms in self-defense. *Id.* at 501 (quoting *Heller*, 544 U.S. at 626). *Jackson* further observed that *Bruen* itself repeatedly emphasized "that the Second Amendment protects the right of a '*law-abiding citizen*' to keep and bear arms." *Id.* at 503 (quoting Bruen, 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138, 2150, 2156) (emphasis added). Upon surveying the historical record, the *Jackson* court reasoned that "there is no requirement for an individualized determination of dangerousness to each person in a class of prohibited persons." *Id.* at 504. Instead, history demonstrates that legislatures typically "prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed."[5] *Id.* These "legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people to 'an orderly society and compliance with legal norms,' not merely to address a person's demonstrated propensity for violence." *Id.* at 503 (quoting *Range v. Att'y Gen.*, 53 F.4th 262, 281-82 (3d Cir. 2022)). The

---

[5]  In reaching its conclusions, *Jackson* took guidance from the decision in *Range v. Att'y Gen.*, 53 F.4th 262 (3d Cir. 2022) (hereinafter, "*Range I*"), which a Third Circuit en banc decision overruled in *Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (en banc) (hereinafter, "*Range II*").

court concluded the statute was constitutional as applied to the defendant because he was "not a law-abiding citizen, and history support[ed] the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." *Id.* at 504.

### B.    Mr. Thomas's Motion to Dismiss

Mr. Thomas concedes the Eighth Circuit has already held that section 922(g)(1) is constitutional. (ECF No. 48 at 1, 6.) Moreover, he makes the same arguments the *Jackson* court already considered and rejected. (*Id.* at 3-6.) But it is black letter law that the Court is "bound … to apply the precedent of" the Eighth Circuit. *Hood v. United State*s, 342 F.3d 861, 864 (8th Cir. 2003). Because the Eighth Circuit has held that section 922(g)(1) is constitutional, Mr. Thomas's arguments are without merit. Accordingly, the Court recommends that Mr. Thomas's Motion to Dismiss also be denied.

### RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1.    Brennan Walter Thomas's Motion to Suppress Evidence as a Result of Illegal Search and Seizure (ECF No. [31]) be **DENIED**; and

2.    Brennan Walter Thomas's Motion to Dismiss Indictment (ECF No. [48]) be **DENIED.**

Dated: December 13, 2023                    *s/ Dulce J. Foster*
                                            DULCE J. FOSTER
                                            United States Magistrate Judge

## <u>NOTICE</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).